IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| TYSON SHELL and MELINDA SU SHELL, Personal Representatives of the Estate of HAYDEN SHELL, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>DEBRA L. SUDAN, M.D., AMY DUHACHEK-STAPELMAN, M.D., SASHA SHILLCUTT, M.D., NEBRASKA MEDICAL CENTER, and DOES 1-5,<br><br>Defendants. | 8:08CV260<br><br>MEMORANDUM AND ORDER |

By telephone conference held March 11, 2010, oral argument was heard on plaintiff's motion to compel discovery (Filing 86) and the responsive motions for attorney's fees (Filing 97) and for a protective order (Filing 99) filed by the Nebraska Medical Center ("NMC"). For the reasons discussed below, the court finds that the plaintiffs' motion should be granted in part, and denied in part, and the NMC's motions should be denied.

BACKGROUND

This is an action for medical malpractice. The Second Amended Complaint (Filing 57) alleges that plaintiffs' infant son, Hayden Shell was admitted to the Nebraska Medical Center on August 23, 2006 for an ostomy takedown and possible Bianchi bowel-lengthening

procedure. The surgery was performed by defendant Sudan. Defendants Duhachek-Stapelman and Shillcutt were the anesthesiologists.

Plaintiffs allege that the defendants failed in their pre-operative assessments of Hayden to recognize and respond to Hayden's low blood sugar, weak liver and risk of hypoglycemic reactions to a prolonged surgical procedure. During the procedure, the defendants allegedly failed to properly monitor Hayden's blood glucose and failed to properly support Hayden with dextrose.

After the procedure, Hayden became severely hypoglycemic. Plaintiffs allege that the defendants failed to timely recognize, diagnose and treat the signs and symptoms of this process. Consequently, Hayden sustained a severe global brain injury, which left him in a vegetative state until his death on December 31, 2006. Plaintiffs allege that Hayden suffered physically and mentally as a result of his neurologic devastation and frequent seizures.

All defendants originally denied any element of negligence in their treatment of Hayden Shell.

The depositions of Dr. Duhachek-Stapelman and Dr. Shillcutt were scheduled to be taken in Omaha on December 1, 2009, along with the deposition of Dr. Stephen Smith, the Chief Medical Officer of the Nebraska Medical Center. Dr. Sudan's deposition was scheduled to be taken in January in Durham, North Carolina. The depositions of Dr. Sudan and Dr. Shillcutt were postponed after disputes arose during the depositions of Dr. Duhachek-Stapelman and Dr. Smith.

On Tuesday, November 24, 2009, two days before the Thanksgiving holiday, the defendants' attorneys notified plaintiff's counsel that the defendants had agreed among themselves to admit that the standard of care had been breached; however, they would continue to deny the nature, extent and proximate cause of any damages, injuries and/or the death of Hayden Shell. Defense counsel read the following "stipulation" into the record prior to the Duhachek-Stapelman deposition:

> Come now the defendants and each of them admit that there was a breach of the standard of care concerning their care and treatment of Hayden Shell with respect to the surgery of August 23, 2006, but continue to deny the nature, extent and proximate cause of any damages, injuries and/or the death of Hayden Shell.

Filing 83-1, 35:3-23.

During the deposition of Dr. Smith, defense counsel instructed the witness not to answer questions related to this stipulation, for the reason that "we've already admitted liability." (Filing 83-2, 144:13-14).

## LEGAL ANALYSIS

### A. Claims for Professional Malpractice; Effect of Defense Stipulation on Scope of Discovery

Under Fed. R. Civ. P. 26(b)(1), the parties to a lawsuit may obtain "discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Relevant information need not be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. "Relevancy is broadly construed, and a request for discovery should be considered relevant if there is 'any

possibility' that the information sought may be relevant to the claim or defense of any party. A request for discovery should be allowed 'unless it is clear that the information sought can have no possible bearing' on the claim or defense of a party." *Moses v. Halstead*, 236 F.R.D. 667, 671 (D. Kan. 2006) (footnotes omitted).

In this diversity case, the plaintiff's claims are governed by Nebraska law. In a malpractice action involving professional negligence, the plaintiff bears the burden of proving (1) the generally recognized medical standard of care, (2) that there was a deviation from that standard by the defendant, and (3) that the deviation was the proximate cause of the plaintiff's alleged injuries. *Snyder v. Contemporary Obstetrics & Gynecology, P.C.*, 258 Neb. 643, 651 605 N.W.2d 782, 791 (2000) (citing *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999)). The plaintiff must prove each element by a preponderance of the evidence. *Id.*, 605 N.W.2d at 791. "A defendant's negligence is, therefore, not actionable unless it is a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them." *Id.*, 605 N.W.2d at 791.

Although all of the defendants have agreed that they deviated from the applicable standard of care, they all continue to deny causation. Thus, contrary to Mr. Welch's pronouncement during the Smith deposition, none of the defendants admitted liability for professional malpractice by entering into the stipulation. The plaintiffs are still faced with the burden of proving that the defendants' deviation(s) from the applicable standard(s) of care proximately caused or proximately contributed to the injuries and damages alleged in the

complaint. Nor does the defense stipulation address any issue related to joint and several liability or the allocation of damages among defendants. *See* Neb. Rev. Stat. § 25-21,185.10; *Estate of Powell ex rel. Powell v. Montange*, 277 Neb. 846, 765 N.W.2d 496 (2009).

In this court's view, the defense stipulation did nothing that would tend to limit the scope of discovery. The topics of inquiry pursued by the plaintiffs were well within the scope of "relevant" discovery, and the defendants' "relevance" objections were not well-founded.[1]

### B. Conduct During Depositions

Rule 30(c) of the Federal Rules of Civil Procedure governs the conduct of depositions:

> **(1) *Examination and Cross-Examination.***
> The examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence, except Rules 103 and 615. After putting the deponent under oath or affirmation, the officer must record the testimony by the method designated under Rule 30(b)(3)(A). The testimony must be recorded by the officer personally or by a person acting in the presence and under the direction of the officer.
>
> **(2) *Objections.***
> An objection at the time of the examination–whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition–must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection. An objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to

---

[1] On January 7, 2010, the court granted the motions of defendants Sudan, Duhachek-Stapelman, and NMC for leave to file amended answers to admit they breached the applicable standard of care in their treatment of Hayden Shell. A similar motion was later granted as to defendant Shillcutt, who filed an amended answer on March 29, 2010. In granting these motions, the court did not anticipate that the amendments would significantly limit the scope of discovery, as all of the defendants still contest the essential element of causation.

> enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).

Rule 30(d), in turn, provides:

> **(3)** *Motion to Terminate or Limit.*
>   **(A)** *Grounds.* At any time during a deposition, the deponent or a party may move to terminate or limit it on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party. The motion may be filed in the court where the action is pending or the deposition is being taken. If the objecting deponent or party so demands, the deposition must be suspended for the time necessary to obtain an order.
>   **(B)** *Order.* The court may order that the deposition be terminated or may limit its scope and manner as provided in Rule 26(c). If terminated, the deposition may be resumed only by order of the court where the action is pending.

The behavior of counsel during the two depositions will be evaluated in accordance with these principles.

### A. Deposition of Amy Duhachek-Stapelman

The deposition of Dr. Duhachek-Stapelman (Filing 83-1) proceeded without significant incident until defense counsel announced that, "at some point" he was not going to let the witness answer questions relevant to the standard of care, which issue, he asserted, had been eliminated from the case due to the defendants' stipulation. Plaintiff's counsel noted–correctly–that an attorney may not instruct a witness not to answer unless a claim of privilege was being raised, or the attorney intended to terminate the deposition for a permissible reason. Defense counsel continued to announce that he was not going to let Dr. Duhachek-Stapelman answer "standard of care" questions. (*See* Filing 83-1 at 123:9-124:17;

149:21-151:4; 173:13-24). Defense counsel did ultimately "permit" the witness to testify how she personally breached the standard of care as to Hayden Shell. (Filing 83-1, 223:12-224:23). The court located one instance (225:2) in the 235-page transcript where the defense raised an objection based on the attorney-client privilege. Plaintiff's counsel made it clear that she was not asking Dr. Duhachek-Stapelman for information generated during a peer review process.

The topics of inquiry raised by the plaintiffs during Dr. Duhachek-Stapelman's deposition fell well within the scope of Fed. R. Civ. P. 26(b)(1). The court does not approve of defense counsel interrupting the deposition with statements to the effect that he was not going to "let" Dr. Duhachek-Stapelman answer "standard of care" questions; however, defense counsel did not technically instruct the witness not to answer, and Dr. Duhachek-Stapelman appears to have answered the questions. The court finds that plaintiff's motion must be denied as to the Duhachek-Stapelman deposition.

**B. Deposition of Stephen Smith, M.D.**

*1. The Deposition*

Dr. Smith is currently the Chief Medical Officer of the Nebraska Medical Center. He testified that he helped draft legislation creating the Nebraska Coalition for Patient Safety and was appointed to its board. The Coalition, which is a joint commission of sponsoring organizations, has been building a reporting system so that hospitals can report adverse events into a central body which can then send the reports to hospitals for educational

purposes. Apparently, the hospital is surveyed about every three years, and the last survey was conducted about two years ago. According to Dr. Smith, the NMC retains "volumes" of records for review by the joint commission, including logbooks in various areas of practice and areas in which a deficiency was identified, minutes of meetings, and the like.

Dr. Smith and his staff reviewed Hayden Shell's chart, within a few days of the incident, as an "adverse event." The incident had raised the suspicion as to whether it would be a joint commission sentinel event and he had to review the chart to determine whether a root-cause analysis ("RCA") should be conducted. He agreed that Hayden Shell's case would qualify as a "serious reportable event" within the context of the National Quality Forum. In Nebraska, such incidents are voluntarily reported to the joint coalition; there is no actual requirement that they be reported. Hayden Shell's case was the only case Dr. Smith could recall where a patient suffered hypoglycemia, coupled with serious injury.

According to Dr. Smith, the NMC typically conducts a "failure modes and effects analysis" (FMEA), where a process or system is reviewed and evaluated *prospectively* before being implemented. In this context, plaintiff's counsel asked Dr. Smith,

> Did the FMEA process identify any of the failures that ultimately led to Hayden Shell's neurologic compromise?

(Filing 83-2, 51:9-12). Defense counsel objected, stating that the question "delves into the RCA process which is a privileged question." (51:13-19). Defense counsel agreed that he was taking the position that "because something was discussed in the root-cause analysis,

therefore even parts of it that were not discussed in root-cause analysis are totally off the table[.]" (52:19-53:4). The witness did not answer the question quoted above.

The deposition continued. Dr. Smith's testimony indicates that, apparently, the NMC decided to adopt "crew resource management" (CRM) principles some time prior to 2006. CRM is intended to promote teamwork and communication, as well as the use of checklists and standardization through presurgical routines. The NMC was one of the first academic hospitals to incorporate CRM. Its surgeons, anesthesiology team members, residents, nurses and support staff were trained in CRM by an organization called LifeWings. NMC became a client of LifeWings in August 2005. The transplant center, anesthesia, and house staff were all trained in CRM prior to the date of Hayden Shell's surgery.

The NMC uses an electronic system called Risk MonitorPro for reporting adverse events. Reports can be filed anonymously, and anybody can file a report. The patient safety coordinator, the pharmacy safety coordinator, and all managers can access the reports. The reports are "harm-scored" on a scale of "A" through "I" by the reporting party and evaluated by the patient safety coordinator. Events determined to exceed a score of "F" or above are referred to Dr. Smith. This process is not the same as the RCA process.

In accordance with its procedures, the NMC disclosed to the plaintiffs the findings of this particular adverse event and made changes in response to it. NMC did not show plaintiffs the reports underlying the findings. Dr. Smith recalled that the primary finding

involved communication between the surgeon and anesthesiologist in terms of management of Hayden's TPN (total parenteral nutrition)[2]. There were no other findings.

Apparently citing the peer-review privilege, *see* Neb. Rev. Stat. § 71-2048, defense counsel instructed Dr. Smith not to answer questions as to whether the FEMA process identified any of the failures[3] that ultimately led to Hayden Shell's neurologic compromise (51:9-19); whether Dr. Shillcutt should continue to be employed and working at the NMC in light of what happened in Hayden Shell's case (119:10-120:5); the steps of an FMEA system as to surgical management of TPN-dependent patients (124:6-10); redundancies in the system of managing TPN patients to assure that any failures could be identified and corrected (124:23-125:10); the allocation of responsibility between the surgeon and the anesthesiologist in conducting perioperative and intraoperative glucose monitoring (126:9-12); and whether the NMC is being "accountable" to the decedent's parents by not answering questions about what happened during Hayden Shell's surgical procedure (126:13-127:7).

The deposition continued. Dr. Smith testified that Dr. Sudan had contacted him to report an adverse event involving Hayden Shell. Dr. Sudan described the procedure and reported that Hayden did not wake up after surgery and had low blood sugar. The magnitude of the blood sugar made the incident of great concern to her. Dr. Smith and Dr. Sudan then

---

[2]For background purposes, plaintiff's brief (Filing 87) indicates that Hayden Shell was about one year old on the date of the surgery. He was born with short bowel syndrome, had had a colostomy, and received TPN intravenously 20 hours each day.

[3]Again, Dr. Smith has testified that the sole finding involved communication between the surgeon and anesthesiologist in terms of management of Hayden's TPN.

met with Hayden's mother in the waiting room of the pediatric ICU. The doctors had not yet conducted an investigation, did not have enough information to answer all of her questions, and did not want to give her conflicting information.

Dr. Smith and Dr. Sudan agreed that a root-cause analysis should be done as quickly as possible. During the RCA process, the patient safety coordinator reviews the chart and makes a timeline of the events. The team (nurses, pharmacists, doctors, etc.) involved in the patient's care is assembled. The team conducts a group discussion (or a series of group discussions) regarding the timeline, the accuracy of the charts, and their recollections of the incident. A report is then issued by the patient safety coordinator. Legal counsel do not attend the RCA meetings.

The RCA in this case was not completed until October 2, 2006. Dr. Smith speculated that the delay might be due to scheduling issues. Dr. Smith, Dr. Sudan, and possibly others subsequently met with Melinda Shell and explained to her that "there were communication gaps between surgery and anesthesia." (Filing 83-2, 151:5-15). According to Dr. Smith, they "probably" talked about the process, who was involved, what steps they would have done, and the procedures they were contemplating to put in place, i.e., to incorporate discussion regarding TPN into the pre-procedure conference or time-out, and to implement a policy for interoperative glucose monitoring. (Filing 83-2, 152:3-8). This policy was implemented in August 2007. (Filing 83-2, 152:14).

Dr. Smith had testified several times that he felt the hospital had maintained its accountability and had been consistent and thorough in this matter. In this context, plaintiff's counsel inquired as to why the NMC had suddenly agreed that it breached the standard of care after denying the same for the past two years. Defense counsel instructed the witness not to answer questions related to this stipulation, announcing: "[W]e've already admitted liability." (Filing 83-2, 144:13-14). Defense counsel then complained that the questions were argumentative, and later cited the attorney-client privilege.[4] (Filing 83-2, 147-148). In response to plaintiff's counsel stating her position on the record, counsel for Dr. Sudan gratuitously interjected the comment, "Jesus." (Filing 83-2, 146:24-147:2).

### 2. NMC's Assertion of the "Peer Review Privilege"

Plaintiffs contend that counsel for the NMC improperly invoked Nebraska's statutory peer review privilege. In response, NMC seeks a protective order.

Rule 501 of the Federal Rules of Evidence provides that state law supplies the rule of decision on privilege in diversity cases. The "peer review privilege" invoked by the NMC, which is purely statutory, provides:

> The proceedings, minutes, records, and reports of any medical staff committee or utilization review committee as defined in section 71-2046, together with all communications *originating in such committees* are privileged communications which may not be disclosed or obtained by legal discovery proceedings unless (1) the privilege is waived by the patient and (2) a court of record, after a hearing and for good cause arising from extraordinary

---

[4]The witness responded that it was not his decision; it was a decision made by counsel. (Filing 83-2, 144:1-2). In light of this response, it appears that the information is protected under Fed. R. Civ. P. 26(b)(3).

-12-

> circumstances being shown, orders the disclosure of such proceedings, minutes, records, reports, or communications. Nothing in sections 71-2046 to 71-2048 shall be construed as providing any privilege to hospital medical records kept with respect to any patient in the ordinary course of business of operating a hospital nor to any facts or information contained in such records nor shall sections 71-2046 to 71-2048 preclude or affect discovery of or production of evidence relating to hospitalization or treatment of any patient in the ordinary course of hospitalization of such patient.

Neb. Rev. Stat. § 71-2048 (emphasis added).

This statutory privilege is "narrowly construed," and the party asserting the privilege bears the burden of proving that the requested information is actually privileged. *State ex rel. AMISUB, Inc. v. Buckley*, 260 Neb. 596, 610, 618 N.W.2d 684, 694 (2000). The peer review privilege applies only to proceedings, minutes, records, reports and communications that originate "in the hospital-wide medical staff committee and hospital-wide utilization review committee as defined in § 71-2046[5]." *Id.* at 611, 618 N.W.2d at 695. Based on the arguments presented in the NMC's various writings, it appears that the RCA team assembled to investigate the Hayden Shell incident is the applicable hospital-wide committee.

The court has carefully reviewed the deposition of Dr. Smith. It does not appear to the court that plaintiff's counsel actually asked Dr. Smith for information about any

---

[5]Neb. Rev. Stat. § 71-2046 provides:
Each hospital licensed in the State of Nebraska shall cause a medical staff committee and a utilization review committee to be formed and operated for the purpose of reviewing, from time to time, the medical and hospital care provided in such hospital and the use of such hospital facilities and for assisting individual physicians and surgeons practicing in such hospital and the administrators and nurses employed in the operation of such hospital in maintaining and providing a high standard of medical and hospital care and promoting the most efficient use of such hospital facilities.

proceedings, minutes, records, reports and communications that originated in the RCA team's investigation of this incident. Although its attorney clearly did not like the plaintiff's questions, the NMC's "peer review privilege" objections were broadly speculative and were not confined to the questions actually asked of Dr. Smith.

The court finds that the NMC has failed to meet its essential burden of proving that the peer review privilege applied to the information actually sought during this deposition. Narrowly construing the privilege, as is required, the court finds that the NMC improperly invoked the peer review privilege in every instance cited in the plaintiff's motion. Because the NMC has not established any claim of peer review privilege, the court need not consider whether the asserted privilege has been waived.

### C. Summary and Conclusion

Defense counsel's "stipulation" read into the record immediately prior to Dr. Duhachek-Stapelman's deposition did not concede "liability" for professional malpractice. Because all issues of causation and damages remain pending, this "stipulation" does not serve to limit the scope of discovery.

Under Fed. R. Civ. P. 30(c), "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Rule 30(d)(3) allows a deponent or a party to "move to terminate or limit [the deposition] on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party."

Based on a thorough review of both depositions, the court finds that neither deposition was conducted in bad faith, or in a manner that unreasonably annoyed, embarrassed or oppressed the deponents or the defendants. The defendants repeatedly declined to invoke the protection offered by Rule 30(d)(3). Rather, during both depositions, defense counsel made unfounded relevance objections based on the defense "stipulation." Defense counsel disrupted the Duhachek-Stapelman deposition by threatening to instruct the witness not to answer questions about "standard of care." At the end of the day, however, this witness was not actually instructed not to answer.

The NMC has failed to prove that it was entitled to any protection under the peer review privilege, Neb. Rev. Stat. § 71-2048, and is not entitled to the issuance of a protective order. Since counsel for the NMC instructed Dr. Smith not to answer numerous questions directed to legitimate topics of inquiry, it may be necessary for the plaintiffs to reconvene the deposition of Dr. Smith in order to fairly examine the deponent, and plaintiffs will be given leave to do so. *See* Fed. R. Civ. P. 30(d)(1).

**ORDER**

For the reasons discussed above,

**IT IS ORDERED:**

1. Plaintiffs' Motion to Compel Discovery (Filing 86) is denied as to the deposition of Amy Duhachek-Stapelman. The motion is granted, as to the deposition of Dr. Stephen Smith, because defense counsel repeatedly and improperly invoked the peer review privilege,

Neb. Rev. Stat. § 71-2048, and instructed the witness not to answer questions directed to legitimate topics of inquiry.

2. Plaintiffs are hereby given leave to reconvene the deposition of Dr. Stephen Smith. If plaintiffs elect to do so, the deposition shall be limited to **three hours** and shall be conducted at a mutually convenient time. The NMC shall pay all costs, including reasonable attorney's fees and expenses, incurred by the plaintiffs in reconvening Dr. Smith's deposition. *See* Fed. R. Civ. P. 37(a).

3. The motions for attorney's fees (Filing 97) and for a protective order (Filing 99) filed by defendant Nebraska Medical Center are denied.

A party may object to this order by filing an "Objection to Magistrate Judge's Order" within 14 days after being served with the order. The objecting party must comply with all requirements of NECivR 72.2.

**DATED March 31, 2010.**

BY THE COURT:

s/ F.A. Gossett
**United States Magistrate Judge**

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.